UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RONALD AMBROSE,

                              Plaintiff,

           -v-

THE CITY OF NEW YORK, DETECTIVE
VITO BUONSANTE, LIEUTENANT SHIELDS,
DETECTIVE JOSE ROSARIO, DETECTIVE
DAN DANAHER, and JOHN and JANE DOES,

                              Defendants.

Case No. 02-CV-10200 (KMK)

OPINION AND ORDER

Appearances:

Lawrence A. Vogelman, Esq.
Shuchman & Krause-Elmslie, P.L.L.C.
Exeter, NH
*Counsel for Plaintiff*

Michael L. Spiegel, Esq.
New York, NY
*Counsel for Plaintiff*

Leah Amber Bynon, Esq.
New York City Law Department, Office of the Corporation Counsel
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Ronald Ambrose ("Plaintiff") brings this action against Detective Vito

Buonsante, "Lieutenant Shields," Detective Jose Rosario, Detective Dan Danaher, and unnamed

"officers, employees and agents" ("John and Jane Does," or "Does") of the New York Police

Department ("NYPD") (collectively, the "Individual Defendants"), as well as against the City of

New York (the "City"), pursuant to 42 U.S.C. § 1983 ("Section 1983").  (Second Am. Compl.

("SAC") ¶ 8).)  The lawsuit, which stems from murder charges of which Plaintiff was acquitted, alleges violations of Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and under New York state law.  (SAC ¶ 1.)  In particular, Plaintiff alleges that Defendants subjected him to false arrest and malicious prosecution (*id.* ¶ 40), fabricated evidence against him (*id.* ¶ 41(b)), and failed to disclose exculpatory evidence to him or to the grand jury that indicted him (*id.* ¶¶ 31-32, 35).

Plaintiff's Second Amended Complaint includes Section 1983 claims against the City pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  In particular, Plaintiff alleges that the City "failed to properly train, supervise or discipline its police detectives . . . concerning correct practices in the interviewing of witnesses to crimes and identification procedures, and the obligation not to present deceptive evidence to the grand jury or manufacture probable cause" (SAC ¶ 44), and that the City, "acting through . . . the Office of the District Attorney of the County of New York, . . . fail[ed] to effectively train, supervise, and discipline its Assistant District Attorneys . . . concerning correct practices in conducting investigations, interviewing witnesses, conducting identification procedures, handling exculpatory evidence, and presenting cases to the grand jury" (*id.* ¶ 46).  Plaintiff alleges that these deficiencies constituted "policies, practices, customs," or "usages" of the City (*id.* ¶¶ 43, 45-46), that the City was "aware" that such deficiencies "lead[] to improper conduct" by the City's police detectives and Assistant District Attorneys (*id.* ¶¶ 45, 48), that the City "acted with deliberate indifference" in not correcting the deficiencies (*id.* ¶¶ 45, 48), and that the deficiencies were a "direct and proximate cause" of the constitutional harms suffered by Plaintiff (*id.* ¶¶ 45-46).

Defendants move to dismiss Plaintiff's *Monell* claims against the City pursuant to Rule

12(c) of the Federal Rules of Civil Procedure ("Rule 12(c)").  In the alternative, Defendants

request bifurcation of Plaintiff's *Monell* claims from his other claims, and a stay of discovery as

to the *Monell* claims.  For the reasons stated herein, Defendants' Rule 12(c) motion is granted in

part and denied in part, and Defendants' motion to bifurcate and stay discovery as to Plaintiff's

surviving *Monell* claims is denied.

I.  Background

A.  Facts

For the purposes of this motion, the Court accepts as true the allegations in Plaintiff's

Second Amended Complaint, as described below.

1.  The September 22, 1999 Shootings and Plaintiff's Arrest

On September 22, 1999, four individuals were shot in front of 330 East 26th Street in

New York County.  (SAC ¶ 15.)  Two of these individuals died.  (*Id.*)  The Individual

Defendants and Assistant District Attorney Kerry O'Connell investigated the shootings.  (*Id.*

¶¶ 11, 16-17.)

Twenty to thirty people were present at the scene of the shootings, and approximately

forty-five people called 911.  (*Id.* ¶ 26.)  None of them, in speaking to the police, "described

anything unusual about a perpetrator's hand or arm."  (*Id.*)  Rather, "several witnesses explicitly

described the perpetrators using both hands and arms during the shootings and flight from the

scene."  (*Id.*)

Buonsante ultimately learned that the shootings were in retaliation for a fight that had

occurred outside the Cheetah Club in Manhattan on the previous day — September 21, 1999 —

at approximately three o'clock in the morning.  (*Id.* ¶ 18.)  Buonsante learned that the fight was

between an individual named Ramone Cross and his friends, on one side, and a "group associated with the victims of the shootings," on the other.  (*Id.*)  NYPD detectives interviewed Cross's "former wife" in order to identify who was with Cross on the night of the fight.  (*Id.* ¶ 19.)  She informed the detectives that Cross had a friend named "Ambrose," and she identified a picture of Plaintiff as that friend.  (*Id.*)

Based on this identification of Plaintiff, Buonsante created a photo array containing six pictures of African-American men, including Plaintiff.  (*Id.* ¶ 20.)  On September 26, 1999, the photo array was shown to Barbara Brown, a witness to the shootings, and Brown identified Plaintiff as "the 'man with the gun' at the shootings."  (*Id.*)  Brown did not "mention[] anything unusual about a perpetrator's hand or arm."  (*Id.* ¶ 26.)  On the next day, September 27, the same photo array was shown to two police officers who had responded to the September 21 fight at the Cheetah Club, and both officers identified Plaintiff as having been present at the scene of that fight.  (*Id.* ¶ 21.)

On September 27, 1999, Rosario arrested Plaintiff.  (*Id.* ¶ 22.)  At the time of Plaintiff's arrest, "it was immediately apparent" to Rosario that Plaintiff's left arm was in a hard plaster cast extending from the middle of his upper arm to his knuckles, at a right angle, and in a sling. (*Id.* ¶ 23.)  In an initial post-arrest interview with Plaintiff, at which O'Connell was also present, Buonsante questioned Plaintiff about his cast, and Plaintiff replied that "he was injured in an automobile accident on the morning of September 21, 1999."  (*Id.* ¶¶ 24-25.)  Plaintiff had fractured his left wrist in this accident, which took place approximately six hours after the Cheetah Club fight and thirty-four hours before the shootings.  (*Id.* ¶ 23.)  At some point, Plaintiff produced — and Buonsante examined — hospital records, an NYPD Accident Report,

4

and a receipt for the Accident Report, which corroborated that the accident took place and that Plaintiff's left arm was placed in a cast on September 21.  (*Id.* ¶ 25.)

### 2.  Plaintiff's Placement in Police Lineup and Arraignment

Later on September 27, approximately five hours after Plaintiff's arrest, Buonsante, Shields, Rosario, and Does conducted a lineup including Plaintiff and five other individuals.  (*Id.* ¶ 27.)  O'Connell was also present during this lineup.  (*Id.* ¶ 24.)  The appearances of the five other individuals in the lineup were "grossly different from [P]laintiff, and from the descriptions of the perpetrators given by witnesses."  (*Id.* ¶ 27.)  The officers "conducted the lineup so that all six persons in the lineup had their left arms hidden from view by being placed inside loose jackets, and did not inform the witnesses [viewing the lineup] of why this was done."  (*Id.*)

Five witnesses to the shootings viewed the lineup.  (*Id.*)  Of the five witnesses, two could not identify any of the six individuals in the lineup.  (*Id.*)  Two other witnesses, including Barbara Brown, identified Plaintiff as having been present at the shootings.  (*Id.*)  The fifth witness, Edgar Rivera, had within one hour of the shootings "positively identified" a man named Samuel Hill, "who bore no resemblance" to Plaintiff, as having been involved.  (*Id.*)  Upon viewing the lineup, Rivera did not at first identify Plaintiff.  (*Id.*)  Rosario then took Rivera to an office at the police precinct and spoke to him; upon returning approximately twenty minutes later, Rivera again viewed the lineup, and thereafter identified Plaintiff as "one of the shooters." (*Id.*)  Rivera further stated that Plaintiff was "the same individual Rivera had previously identified as being Samuel Hill."  (*Id.*)

None of the five witnesses who viewed the lineup described any of the shooters as "having anything unusual about one hand or arm."  (*Id.* ¶ 28.)  At no point either before or after

the witnesses viewed the lineup did Defendants ask any of these witnesses whether they had observed anything unusual about a shooter's hand or arm.  (*Id.*)

On September 28, Plaintiff was arraigned on first degree murder charges.  (*Id.* ¶ 29.)

### 3.  Pre-Indictment Discovery of Exculpatory Evidence

On September 30, 1999, Duane Thomas, who had driven the shooters to and from the scene of the shooting, turned himself in to the police.  (*Id.* ¶ 30.)  Thomas told Buonsante, Danaher, and Does that Plaintiff was not involved in the shootings.  (*Id.*)  Thomas said that he did not see Plaintiff on the day of the shootings and did not hear Plaintiff's name mentioned by any other perpetrator during preparation for the shootings, while Thomas was driving the perpetrators away from the shootings, or at meetings of the perpetrators the following day.  (*Id.*)  At some point, Defendants obtained telephone records that corroborated Thomas's account, as they showed calls among the perpetrators identified by Thomas, but no calls between Plaintiff and any of the perpetrators.  (*Id.*)

### 4.  Grand Jury Indictment of Plaintiff

After conferring with the Individual Defendants about the evidence concerning Plaintiff's involvement in the shootings, O'Connell presented the case against Plaintiff to a grand jury.  (*Id.* ¶ 31.)  By this time, NYPD had confirmed that Plaintiff had a cast placed on his arm prior to the shootings.  (*Id.*)  Some of the witnesses who viewed the lineup on September 27 testified before the grand jury; prior to the witnesses' testimony, no Defendant informed any of them of the condition of Plaintiff's arm at the time of the shootings.  (*Id.*)  Nor was the grand jury presented with any evidence concerning the condition of Plaintiff's arm or with Thomas's account of the shootings, the latter of which was not disclosed to Plaintiff's defense counsel prior to the grand

jury presentation.[1]  (*Id.* ¶¶ 31-32.)

On October 25, 1999, Plaintiff was indicted on first degree murder charges.  (*Id.* ¶ 33.)

### 5.  Post-Indictment Discovery of Further Exculpatory Evidence

On February 8, 2000, Buonsante and Does interviewed Pey Lee, who had provided a gun used in the shooting.  (*Id.* ¶ 34.)  Lee stated that he had made arrangements to provide a gun to the perpetrators, that he gave the gun to the perpetrators while they were in a car with Thomas, and that he attended a meeting with the perpetrators after the shooting.  (*Id.*)  According to Lee, Plaintiff was not present when Lee gave the perpetrators the gun, and Plaintiff's name was not otherwise mentioned by the perpetrators.  (*Id.*)

In January 2001, Andrew Rison, a cousin of Damon Williams — whom Duane Thomas had identified as a perpetrator — notified the police that Williams, a fugitive, was located in Virginia.  (*Id.* ¶ 35.)  Rison also told the police that Williams had (1) admitted his own participation in the shootings, (2) stated that Plaintiff was not involved in the shootings, and (3) expressed his belief that Plaintiff had been mistaken for Williams.  (*Id.*)  Rison's statements were never disclosed to Plaintiff's counsel during the pendency of the criminal proceedings against Plaintiff.  (*Id.*)

### 6.  Plaintiff's Trial and Acquittal

Prior to Plaintiff's criminal trial in state court, Plaintiff's defense counsel requested that the prosecution turn over to the defense, as *Brady* material, testimony Duane Thomas had given before a grand jury.  (*Id.* ¶ 36.)  O'Connell argued that Thomas's grand jury testimony was not

---

[1] A second grand jury was convened in order to seek an indictment of Thomas (SAC ¶ 32), and Thomas's account exculpating Plaintiff was presented to that grand jury (*id.* ¶ 36).

*Brady* material, but at a pre-trial conference the court ordered that the testimony be turned over pursuant to *Brady*.  (*Id.*)

At Plaintiff's criminal trial, Duane Thomas testified that Plaintiff was not involved in the shootings.  (*Id.* ¶ 30.)  Plaintiff was acquitted on all counts, and he was released on November 29, 2001, after having been incarcerated for over two years.  (*Id.* ¶¶ 33, 37.)

B.  Procedural History

Plaintiff's initial Complaint in this action was filed on December 24, 2002.  Defendants moved to dismiss all claims pursuant to Rule 12(c).  On February 4, 2004, Judge Denny Chin, to whom this case was originally assigned, denied Defendants' motion and granted Plaintiff's request for leave to amend his Complaint.[2]  On August 10, 2004, the Parties appeared before Judge Chin in connection with Plaintiff's motion to compel discovery as to his *Monell* claims that the City was liable under Section 1983 for misconduct by employees of the Office of the District Attorney.  (Defs.' Mem. of Law in Supp. of Partial Mot. to Dismiss ("Defs.' Mem.") 2; Pl.'s Mem. of Law in Opp'n to Partial Mot. to Dismiss ("Pl.'s Mem.") 11.)  Judge Chin denied without prejudice Plaintiff's motion to compel discovery, granted Plaintiff leave to file a Second Amended Complaint, and granted Defendants permission to subsequently file a Rule 12(c) motion to dismiss.  (Defs.' Mem. 2; Pl.'s Mem. 11.)  Plaintiff filed his Second Amended Complaint on October 22, 2004.

II.  Discussion

The only claim at issue in this motion is Plaintiff's *Monell* claim against the City under Section 1983.  Plaintiff's specific allegations involve a failure by the City to train law

_____

[2] The case was reassigned to this Court on September 30, 2004.

enforcement personnel.  Regarding NYPD officials, Plaintiff alleges that the City "failed to properly train, supervise or discipline its police detectives . . . concerning correct practices in the interviewing of witnesses to crimes and identification procedures, and the obligation not to present deceptive evidence to the grand jury or manufacture probable cause."  (SAC ¶ 44.) Regarding the City's prosecutors, Plaintiff alleges that the District Attorney's Office "had actual and/or *de facto* policies, practices, customs and/or usages of failing to effectively train, supervise, and discipline its Assistant District Attorneys . . . concerning correct practices in conducting investigations, interviewing witnesses, conducting identification procedures, handling exculpatory evidence, and presenting cases to the grand jury."  (*Id.* ¶ 46.)

The Court construes Defendants' motion as seeking dismissal of all *Monell* claims against the City.  Although Defendants' motion papers argue primarily for dismissal of "the *Monell* claims pertaining to the District Attorney's Office" (Defs.' Mem. 3; *id.* 7, 19; Defs.' Reply Mem. of Law in Supp. of Partial Mot. to Dismiss ("Defs.' Reply Mem.") 1) — and Plaintiff's opposition to the motion is similarly limited — Defendants also ask the Court to dismiss "all purported *Monell* claims" (Defs.' Mem. 21; Defs.' Reply Mem. 11), and argue in a footnote that "Plaintiff cannot sustain a *Monell* claim based on the actions of the NYPD detectives" (Defs.' Mem. 13 n.8).  Accordingly, the Court also considers whether Plaintiff has adequately stated a *Monell* claim as to the City's failure to train, supervise, or discipline its police officers.

A.  Standard of Review

Rule 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings."  "Judgment on the pleadings is

appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).  In deciding a Rule 12(c) motion, the court applies "'the same standard as that applicable to a motion under Rule 12(b)(6) [of the Federal Rules of Civil Procedure], accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party.'" *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004) (quoting *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999)).

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted) (second alteration in original).  In *Bell Atlantic Corp. v. Twombly*, *see id.* at 1964-69, the Supreme Court abandoned reliance on the oft-cited line from *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." As the Court explained in *Twombly*, a literal application of *Conley*'s "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly*, 127 S. Ct. at 1968 (alteration in original). Instead, the Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 1965, and that "once a claim has been stated adequately, it

may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 1969. Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. If plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.*; *see also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) ("After careful consideration of the Court's [*Twombly*] opinion . . . , we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." (emphasis in original)).

Federal Rule of Civil Procedure 8(a)(2) requires only that a complainant include "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2) "do[es] not require a claimant to set out in detail the facts upon which he bases his claim." *Leatherman v. Tarrant County Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993) (internal quotation marks omitted). There is no heightened pleading requirement for complaints alleging municipal liability under Section 1983. *See id.*; *Woodrow v. Vill. of Ballston Spa Police Dep't*, No. 08-CV-53, 2008 WL 1805816, at *4 (N.D.N.Y. Apr. 18, 2008) (noting that "no heightened pleading standard should be applied to § 1983 actions alleging claims for municipal liability under *Monell*").

### B. Pleading Municipal Liability

#### 1. General Principles

The Supreme Court has held that "the language of § 1983, read against the background of the . . . legislative history, compels the conclusion that Congress did not intend municipalities to

be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691.  To "prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove:  (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).  The fifth element derives from the principle that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right.").  In other words, a municipality may not be liable under Section 1983 "by application of the doctrine of *respondeat superior*." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong").  Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnmental bodies can act only through natural persons, . . . [and] governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").  Moreover, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [government]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) ("Proof

12

of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) (same).  In the end, therefore, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury."  *Roe*, 542 F.3d at 37 (quoting *Brown*, 520 U.S. at 404).

The courts have identified two types of situations that are actionable under Section 1983 as municipal policies; one involves a formal policy officially promulgated, and the other involves a single act by a municipal employee who has final policy-making authority in the area in which the action at issue was taken.  *See Newton*, 566 F. Supp. 2d at 271 (citing *Monell*, 436 U.S. at 690, and *Pembaur*, 475 U.S. at 480-81).  However, a custom need not be the result of a formal proclamation or law:  "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."  *Brown*, 520 U.S. at 404; *see also Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (noting that a municipality's custom "need not be memorialized in a specific rule or regulation").  To prevail on this theory of municipal liability, however, a plaintiff must prove that the custom at issue is permanent.  *See Prapotnik*, 485 U.S. at 127 (noting that the Supreme Court "has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law'" (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970))).

2.  Failure to Train

Plaintiff's theory of municipal liability, as noted above, is that the City failed to train, supervise, or discipline its police officers and prosecutors, and that this failure resulted in the wrongful prosecution against him.  "In *City of Canton, Ohio v. Harris*, the Supreme Court established that a municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training."  *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 129 (2d Cir. 2004) (citing *City of Canton*, 489 U.S. at 387-90); *see also Vassallo*, 591 F. Supp. 2d at 201 (noting that an unconstitutional policy, custom, or practice "may be inferred where 'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction'" (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (internal quotation marks omitted))).  Importantly, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006); *see also id.* ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *Vassallo*, 591 F. Supp. 2d at 201-02 (holding that because there was no constitutional violation by the individual defendants, no *Monell* claim remained against the municipality).

To demonstrate deliberate indifference, a plaintiff must establish three facts:  (i) that a policymaker knows to a "moral certainty" that the municipality's employees will confront a

certain situation; (ii) either that the situation presents the municipal employee with a difficult choice of the type that training or supervision will make less difficult, or that there is a history of municipal employees improperly handling the situation; and (iii) that the wrong choice by the municipal employee will often cause the deprivation of an individual's constitutional rights. *See Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992) (citing *City of Canton*, 489 U.S. at 390 & n.10).

In addition to deliberate indifference, a plaintiff ultimately must identify "a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Amnesty Am.*, 361 F.3d at 129 (quoting *City of Canton*, 489 U.S. at 391). In other words, a plaintiff must demonstrate that the municipal employee's "'shortcomings . . . resulted from . . . a faulty training program' rather than from negligent implementation of a sound program or other, unrelated circumstances." *Id.* at 129-30 (quoting *City of Canton*, 489 U.S. at 390-91). "The elements of an identified training deficiency and a close causal relationship, which together require the plaintiff[] to prove that the deprivation occurred as the result of a municipal policy rather than as a result of isolated misconduct by a single actor, ensure that a failure to train does not collapse into *respondeat superior* liability." *Id.* at 130.

In filing a complaint, however, a plaintiff "is not obliged to plead evidence supporting his allegations of the existence of a custom or policy that allegedly caused the injury in question." *Tsotesi v. Bd. of Educ.*, 258 F. Supp. 2d 336, 338 (S.D.N.Y. 2003). This does not permit Plaintiff to rely only on a conclusory allegation of an unconstitutional policy, *see Oparaji v. City of New York*, No. 96-CV-6233, 1997 WL 139160, at *3 (E.D.N.Y. Mar. 21, 1997), but it is

15

"unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage, and therefore need only plead that the city's failure to train caused the constitutional violation," *Amnesty Am.*, 361 F.3d at 130 n.10. Thus, "[t]he pleading requirement for a municipal liability claim under § 1983 [will be met if a plaintiff alleges] that the implementation of 'a formal policy which is officially endorsed by the municipality' caused the plaintiff's injuries." *Perez v. Westchester County Dep't of Corrs.*, No. 05-CV-8120, 2007 WL 1288579, at *5 (S.D.N.Y. Apr. 30, 2007) (quoting *Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996)). "Even where allegations in the complaint of the existence of an official policy are not buttressed by supporting facts, dismissal is not warranted as long as the defendant has 'fair notice of what the plaintiff's claim is and the grounds upon which it rests[.]'" *Woodrow*, 2008 WL 1805816, at *4 (quoting *Nesbitt v. County of Nassau*, No. 05-CV-5513, 2006 WL 3511377, at *4 (E.D.N.Y. Dec. 6, 2006)). "It is up to the 'liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.'" *Nesbitt*, 2006 WL 3511377, at *4 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)).

    C.  Sufficiency of Plaintiff's Allegations

    "'Section 1983 is only a grant of a right of action; the substantive right giving rise to the action must come from another source.'" *Valez v. City of New York*, No. 08-CV-3875, 2008 WL 5329974, at *2 (S.D.N.Y. Dec. 16, 2008) (quoting *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)). To establish a constitutional violation under Section 1983, a plaintiff must demonstrate that (1) defendants were acting under color of state law at the time of the alleged wrongful action; and (2) the action deprived him or her of a federal constitutional or statutory

right.  *See Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743-44 (2d Cir. 2003).  Plaintiff

adequately alleges that the Individual Defendants and O'Connell were officials acting under

color of state law.  (SAC ¶¶ 9, 12.)

Plaintiff claims that he seeks "relief for defendants' violation of his rights secured by . . .

Section 1983, and . . . the Fourth, Fifth, and Fourteenth Amendments to the United States

Constitution."  (*Id.* ¶ 1.)  The core basis for this action, according to Plaintiff, is an intentionally

and/or recklessly botched investigation and prosecution of him by Defendants.  Indeed, Plaintiff

has provided detailed allegations regarding the investigation that preceded his indictment,

claiming that the Individual Defendants ignored facts which were inconsistent with his

participation in the murder, pressured witnesses to falsely identify Plaintiff as being involved in

the fatal shootings, deceived the grand jury about Plaintiff's guilt, and helped to withhold

exculpatory information from Plaintiff before and during trial.  Similarly, Plaintiff claims that the

unconstitutional misconduct extended to the District Attorney's office, whose employee,

O'Connell, allegedly consulted with the NYPD during its investigation (including during the

September 27, 1999 lineup), withheld exculpatory information from and otherwise misled the

grand jury, and failed to honor her obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to

provide exculpatory information for use at trial.  And, as discussed above, Plaintiff asserts that

the City is legally responsible for this misconduct due to its failure to train its police officers and

prosecutors in proper investigative techniques, identification procedures, grand jury practice, and

disclosure of *Brady* information.

The difficulty in Plaintiff's allegations is not lack of specificity as to Defendants'

misconduct, but rather Plaintiff's failure to identify which alleged misconduct violated each of

the Fourth, Fifth, and Fourteenth Amendments.  Plaintiff's Second Amended Complaint includes

two claims alleging federal causes of action — one alleging deprivation of Plaintiff's

constitutional rights by the Individual Defendants, and the other alleging deprivation of his

constitutional rights by the City — but does not specify the doctrinal bases for those claims.

Consequently, the Court considers all of Plaintiff's allegations and addresses whether

they suffice to state any claims under the Fourth, Fifth, or Fourteenth Amendments.

### 1.  Fifth Amendment Claims

As an initial matter, it is clear that Plaintiff fails to state any claim under the Fifth

Amendment.  Because Plaintiff's lawsuit does not allege any deprivation of his rights by the

federal government, any due process claim he has against the City is properly brought under the

Due Process Clause of the Fourteenth Amendment, not under that of the Fifth Amendment.  *See*

*Mitchell v. Home*, 377 F. Supp. 2d 361, 372-73 (S.D.N.Y. 2005) ("The Fifth Amendment's Due

Process Clause protects citizens against only federal government actors, not State officials.  Any

due process rights plaintiff enjoys as against state government officials . . . arise solely from the

Fourteenth Amendment due process clause." (internal citation omitted)).  Also, although Plaintiff

claims that his grand jury indictment was unfair due to, *inter alia*, the nondisclosure of

exculpatory evidence to the grand jury, any complaint with his grand jury indictment does not

state a Fifth Amendment claim, as the Grand Jury Clause has not been incorporated against the

states through the Fourteenth Amendment.  *See Branzburg v. Hayes*, 408 U.S. 665, 688 n.25

(1972).

### 2.  Fourteenth Amendment Due Process Claims

Plaintiff alleges that the City "fail[ed] to train, supervise and discipline Assistant District

Attorneys concerning their obligation to turn over *Brady* material in a timely fashion to defense counsel" (SAC ¶ 47(c)), that there were several other instances in which prosecutors in the Manhattan District Attorney's office failed to properly turn over *Brady* material to other criminal defendants (*id.* ¶¶ 49-59), and that the City's policy in this regard violated Plaintiff's constitutional rights.  Although Plaintiff does not specify which constitutional provision the City allegedly violated in failing to train its prosecutors as to their *Brady* obligations, the Second Amended Complaint can be fairly read to assert a denial of Plaintiff's Fourteenth Amendment right to due process of law, as protected by *Brady* and its progeny.

"The basic rule of *Brady* is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment."  *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001).  "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness."  *Id.*  "Because *Brady* and its progeny are grounded in the Due Process Clauses of the Constitution, the essential purpose of the rules enunciated in these cases is to protect a defendant's right to a fair trial by ensuring the reliability of any criminal verdict against him."  *Id.*  "The government therefore has a so-called '*Brady* obligation' only where non-disclosure of a particular piece of evidence would deprive a defendant of a fair trial."  *Id.* at 140.  "To demonstrate such a deprivation, a defendant must show that:  (1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice."  *Id.*

Plaintiff claims that Defendants suppressed two pieces of evidence favorable to Plaintiff.

First, Plaintiff alleges that Defendants did not timely disclose to Plaintiff's defense counsel Duane Thomas's statements exculpating Plaintiff; although the Government ultimately turned over Thomas's grand jury testimony to Plaintiff's counsel, it was not until the court ordered the Government to do so before trial, and Defendants had not disclosed Thomas's statements prior to Plaintiff's grand jury indictment.  (SAC ¶¶ 32, 36.)  Second, Plaintiff alleges that Defendants failed to disclose to Plaintiff's counsel, either before or during Plaintiff's criminal trial, information provided by Andrew Rison concerning Damon Williams's alleged statements exculpating Plaintiff.[3]  (*Id.* ¶ 35.)  Both of these claims raise the question of whether a Section 1983 plaintiff may adequately allege violation of his *Brady* due process rights in the absence of the plaintiff's criminal conviction.

Defendants cite cases suggesting that an individual's *Brady* right is violated only when the suppression of exculpatory information reasonably undermines confidence in the verdict; therefore, Defendants argue, even if Defendants should have disclosed exculpatory evidence to Plaintiff's defense counsel, Plaintiff's *Brady* rights were still not violated because he was acquitted of the criminal charges against him.[4]  (Defs.' Mem. 13-16.)  Plaintiff disagrees, asserting that the materiality test cited by Defendants is used merely "to determine whether or

---

[3] There is room for the argument that the allegedly exculpatory hearsay statement (or in this case the double-hearsay statement) of a co-conspirator is not exculpatory, as it is inadmissible.  *See United States v. Salameh*, 54 F. Supp. 2d 236, 281-82 (S.D.N.Y. 1999) (finding that alleged exculpatory statement by co-conspirator was hearsay and would not have been admitted in evidence at trial because it "clearly lack[ed] [sufficient] indicia of reliability" to qualify for an exception to the hearsay rule).  The Court need not resolve this question at this time, as it is willing to assume that Plaintiff has stated a plausible claim that all statements at issue should have been disclosed under *Brady*.

[4] Defendants' motion papers refer only to the exculpatory information provided by Rison, and not to the statements by Thomas, but Defendants' reasoning applies equally to the latter.

20

not a conviction should stand," and "does not define the constitutional deprivation" itself.  (Pl.'s Mem. 9.)  Plaintiff contends that a rule barring the acquitted from asserting their *Brady* rights in a Section 1983 action would provide insufficient incentives for law enforcement officials to comply with their *Brady* obligations.  (*Id.*)

Many cases discussing the *Brady* rule support Defendants' position that *Brady* is concerned only with the reliability of a conviction of a criminal defendant.  Though the Supreme Court and Second Circuit have not had occasion to examine a case in which an acquitted defendant sought vindication of his or her *Brady* rights in a Section 1983 action, their opinions have often used language suggesting that *Brady* does not extend to such a situation.  For instance, the Second Circuit has stated that "the essential purpose of [*Brady* and its progeny] is to protect a defendant's right to a fair trial by ensuring the reliability of any criminal verdict against him."  *Coppa*, 267 F.3d at 139; *see also id.* at 140 ("Although the government's obligations under *Brady* may be thought of as a constitutional duty arising before or during the trial of a defendant, the scope of the government's constitutional duty — and, concomitantly, the scope of a defendant's constitutional right — is ultimately defined retrospectively, by reference to the likely effect that the suppression of particular evidence had on the outcome of the trial."); *accord United States v. Ruiz*, 536 U.S. 622, 628 (2002) ("[T]he right to receive from prosecutors exculpatory . . . material [is] a right that the Constitution provides as part of its basic 'fair trial' guarantee."); *Strickler v. Greene*, 527 U.S. 263, 281 (1999) ("[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."); *United States v. Agurs*, 427 U.S. 97, 112 (1976) (noting that *Brady* "reflect[s] our overriding concern with the justice of the

21

finding of guilt").

The Second Circuit's pronouncements on the timing of disclosures mandated by *Brady* reinforce this focus on ultimate disposition of criminal charges. To the extent that the third *Brady* prong — the requirement that failure to disclose exculpatory evidence resulted in prejudice to a criminal defendant — is ambiguous as to whether the requisite prejudice can be shown absent a criminal conviction, the Second Circuit has indicated that *Brady* does not mandate disclosure of evidence any earlier than the point in time at which the criminal defendant needs access to the evidence so that he or she may effectively use it at a proceeding that determines guilt. *See Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) ("It is not feasible or desirable to specify the extent or timing of disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made. Thus *disclosure prior to trial is not mandated*." (emphasis added)); *id.* ("[T]he longer the prosecution withholds information, or (more particularly) *the closer to trial* the disclosure is made, *the less opportunity there is for use*." (emphases added)); *United States v. Avellino,* 136 F.3d 249, 255 (2d Cir. 1998) ("The government's obligation to make [*Brady*] disclosures is pertinent not only to an accused's preparation for trial but also to his determination of whether or not to plead guilty. The defendant is entitled to make that decision with full awareness of favorable material evidence known to the government.").

Most courts that have directly considered the question have held that an acquittal extinguishes a Section 1983 plaintiff's due process claim for nondisclosure of *Brady* material. *See Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999) ("[T]he withholding or destruction of evidence violates a criminal defendant's constitutional rights only if, as a result of the

withholding or destruction of evidence, the criminal defendant is denied a fair trial. . . .

Regardless of any misconduct by government agents before or during trial, a defendant who is

acquitted cannot be said to have been deprived of the right to a fair trial."); *Flores v. Satz*, 137

F.3d 1275, 1278 (11th Cir. 1998) ("Plaintiff . . . was never convicted and, therefore, did not

suffer the effects of an unfair trial.  As such, the facts of this case do not implicate the

protections of *Brady*."); *Ramirez v. County of Los Angeles*, 397 F. Supp. 2d 1208, 1214 (C.D.

Cal. 2005) ("[T]he evidence of the alleged *Brady* violation . . . fails to establish an independent

[Fourteenth Amendment] claim because Plaintiff was acquitted."); *id.* at 1227 ("The problem

with Plaintiff's independent *Brady* claim is that he actually received all of the evidence before

trial, was found not guilty of the crime and was ultimately adjudged factually innocent.

Therefore, he cannot show that he would have obtained a better result at trial had the information

been disclosed sooner."); *Gregory v. Oliver*, 226 F. Supp. 2d 943, 953 (N.D. Ill. 2002) (Although

"a criminal defendant can assert a federal due process claim against a[] [police] officer who

withheld information or evidence necessary for the fair and impartial trial guaranteed by the U.S.

Constitution . . . , in this instance the officers' purported failure to turn over potentially

exculpatory evidence would not have violated [the plaintiff's] constitutional rights because that

evidence was not material in *Brady* terms — that is, there was no reasonable probability that the

result of the proceeding would have been different if the evidence had been disclosed to the

defense.  And that is so, of course, because [the plaintiff] was acquitted even without the

withheld evidence.  Hence that information could not have had an adverse impact on the

outcome of the trial." (internal citation and quotation marks omitted)).  Other courts have

reached essentially the same conclusion without making direct reference to the *Brady* rule or to

the Due Process Clause.  *See McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir.

1988) ("Because the underlying criminal proceeding terminated in appellant's favor, he has not

been injured by . . . wrongful suppression of exculpatory evidence[ and t]herefore . . . has failed

to state an independent claim based on this act of suppression"); *Hahn v. Sargent*, 523 F.2d 461,

467 (1st Cir. 1975) ("The tardy and reluctant disclosure of exculpatory evidence establishes no

triable issue, for . . . appellant suffered no prejudice as a consequence of the late disclosure.  The

material was made available in time to aid the defense in its cross-examination . . . , and

appellant was acquitted.").

However, some district judges sitting in the Northern District of Illinois have explicitly

adopted the opposite position — namely, the position advocated by Plaintiff here.  For example,

in *Craig v. Chicago Police Officers*, No. 05-CV-172, 2005 WL 1564982 (N.D. Ill. June 9, 2005),

the court held that the plaintiff, who was acquitted in spite of police officers' alleged failure to

provide exculpatory material to the prosecution, had adequately stated a *Brady* due process claim

against the officers.  "Regarding the third element of a *Brady* claim," the court stated, "the

appropriate measure of prejudice is whether the disclosure of the exculpatory evidence . . . would

have prevented the prosecutor from instituting the charges against Craig and proceeding with the

prosecution."  *Id.* at *3.  Accordingly, the court held that it could not "conclude that Craig's

acquittal is fatal to his due process claim" against the police officer defendants.  *Id.* at *4.  The

court in *Carroccia v. Anderson*, 249 F. Supp. 2d 1016 (N.D. Ill. 2003), having reached the same

conclusion as *Craig*, explained its rationale for that ruling:  "If courts prohibit a criminal

defendant from making a civil claim for concealment of material exculpatory evidence simply

because his trial resulted in an acquittal, we tolerate law enforcement misconduct simply because

24

the defendant was able to overcome it by other means.  In this Court's view, such an approach undermines the important interests protected by *Brady* and its progeny."  *Id.* at 1023; *see also Kidd v. City of Chicago*, No. 02-CV-9534, 2003 WL 22243938, at *1-2 (N.D. Ill. Sept. 26, 2003) (holding that despite the plaintiff's acquittal, he adequately stated a due process claim against police defendants who allegedly "conceal[ed] exculpatory evidence from prosecutors," and noting that the "deterrent argument [for imposing Section 1983 liability] applies equally to police who successfully and unsuccessfully attempt to frame innocent defendants"); *Corbett v. White*, No. 00-CV-4661, 2001 WL 1098054, at *2, 5 (N.D. Ill. Sept. 17, 2001) (holding that despite the plaintiff's acquittal, he adequately "stated a claim of procedural due process — a claim that he was denied a fair trial because [police] defendants . . . withheld exculpatory evidence from the prosecutors").

The Seventh Circuit has recently cast doubt on the continued viability, within that Circuit, of the approach reflected by the *Carroccia*, *Craig*, *Kidd*, and *Corbett* decisions.  In *Carvajal v. Dominguez*, 542 F.3d 561 (7th Cir. 2008), the court held that the law enforcement defendant was entitled to summary judgment on the plaintiff's *Brady* claim, determining that "the allegedly suppressed evidence on these facts simply does not rise to the level of a *Brady* violation" for reasons unrelated to the plaintiff's acquittal, but the court also stated that "we are doubtful . . . that an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation," *id.* at 570-71; *see also id.* at 570 (taking issue with the view of the district courts' "prospective" test, noting that such an approach "does not seem to accurately capture what *Brady* protects and misunderstands the 'materiality' requirement in a true *Brady* violation").  *But see id.* at 569 ("Carvajal has not established the third [*Brady*] requirement — materiality or

25

prejudice — because there is no reasonable probability that the failure to disclose would have

. . . caused the prosecutor to forego the trial.").  In *Bielanski v. County of Kane*, 550 F.3d 632

(7th Cir. 2008), the Seventh Circuit restated the skepticism it voiced in *Carvajal* as to the

viability of an acquitted plaintiff's *Brady* claim, affirming the dismissal of her due process claim

in light of the fact that she "ultimately had a trial which resulted in a verdict 'worthy of

confidence,' [i.e., acquittal,]" *id.* at 645 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)),

though the court also concluded in the alternative, as in *Carvajal*, "that the decision to go to trial

would not have been affected by the allegedly withheld evidence," *id.* at 644-45.[5]

The Parties do not cite any cases on point within the Second Circuit, and the Court has

not been able to find any.  Accordingly, this Court considers the viability of Plaintiff's *Brady*

claim to present an issue of first impression within this Circuit, and the Court must decide

whether to adopt the minority view — the approach adopted by a few district judges in the

Northern District of Illinois, and rejected by the Seventh Circuit — or the majority view, which

has been followed explicitly or implicitly by every other court to have ruled on the issue.

This Court adopts the majority view, and holds that the verdict acquitting Plaintiff of the

criminal charges against him negates any violation of his *Brady* rights and extinguishes any

Section 1983 due process claim that might arise from Defendants' alleged suppression of

exculpatory evidence.  The Court is unpersuaded by Plaintiff's claim that the *Brady* "materiality

requirement . . . is a creature of criminal post conviction law."  (Pl.'s Mem. 9.)  While it is true

---

[5] To the extent that these decisions allow for the possibility of a *Brady* claim in cases of acquitted criminal defendants where police officers are alleged to have withheld exculpatory information from prosecutors, on the theory that the prosecutors might not have initiated or proceeded with charges had they known of the exculpatory evidence, *see Craig*, 2005 WL 1564982, at *3-4, such a theory has no application here, given Plaintiff's claim that O'Donnell was aware of, and indeed helped suppress, the allegedly exculpatory evidence.

that many cases evaluating claims of *Brady* violations surface in appeals of criminal convictions, the Supreme Court and the Second Circuit have indicated that a criminal defendant's *Brady* right to disclosure of exculpatory evidence is violated only in the case of prejudice to the ultimate conviction of the criminal defendant.  *See, e.g.*, *Strickler*, 527 U.S. at 281-82; *Coppa*, 267 F.3d at 140.[6]  The Court notes in particular the Second Circuit's holdings that disclosure of *Brady* material is not untimely if a criminal defendant is provided the material in time to use it at the time of trial or plea; the fact that suppression of *Brady* material could prevent a defendant from securing an earlier favorable termination of his or her case is not considered as a potential source of "prejudice" within the meaning of the *Brady* rule.  The *Brady* doctrine is meant to protect criminal defendants from unreliable convictions arising from unfair trials (or plea proceedings), and not from any other type of harm.  *See Coppa*, 267 F.3d at 139 (noting that "the essential purpose" of *Brady* is to "ensur[e] the reliability of a[] criminal verdict").

*Carey v. Piphus*, 435 U.S. 247 (1978), cited by the *Carroccia* court in support of its view that an acquitted plaintiff had stated a *Brady* claim, *see Carroccia*, 249 F. Supp. 2d at 1023-24, is not to the contrary.  *Carey* involved two public school students who had been suspended without

---

[6] In *Strickland v. Washington*, 466 U.S. 668 (1984), considering claims of ineffective assistance of counsel under the Sixth Amendment, the Supreme Court held that a defendant was entitled to a new trial when the incompetence of counsel caused the non-introduction of evidence only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.  The Court defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome."  *Id.*  In *United States v. Bagley*, 473 U.S. 667 (1985), the Court adopted this result-oriented test for *Brady* purposes:  "We find the *Strickland* formulation of the *Agurs* test for materiality sufficiently flexible to cover . . . cases of prosecutorial failure to disclose evidence favorable to the accused: The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  473 U.S. at 682.

any opportunity for a hearing.  *Carey*, 435 U.S. at 251.  The Supreme Court, noting that "the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions," held in *Carey* that if school officials had violated the students' rights to procedural due process, they would be liable under Section 1983 for nominal damages even if the suspensions were justified and would have been imposed in any event had proper hearings been held.  *Id.* at 266-67.  The *Carroccia* court opined that "the right to a fair trial is deserving of treatment similar to that given in *Carey* . . . to the right to procedural due process," in that "the existence of a due process violation giving rise to a civil action under § 1983 [should] not depend on whether the due process violation made a substantive difference in the ultimate decision."  *Carroccia*, 249 F. Supp. 2d at 1023-24.

        This sentiment is understandable but not dispositive.  The right to procedural due process cannot be invoked absent a deprivation of liberty or property; *Carey* does not permit a plaintiff to recover nominal damages if that plaintiff receives a hearing that is procedurally insufficient but nevertheless yields a favorable result.  Thus, just as there is no denial of procedural due process without a constitutionally cognizable deprivation (such as suspension from school), there is no denial of a criminal defendant's right to a fair trial without prejudice to that defendant, i.e., a conviction.  To propose that the withholding of exculpatory evidence *itself*, untethered from any concrete consequences, prejudices a criminal defendant is merely to beg the question.  Moreover, it is well established that many of the Constitution's other protections for criminal defendants may not be invoked pursuant to Section 1983, absent ultimate prejudice to the individual claiming violation.  *See, e.g.*, *Schiavone Constr. Co. v. Merola*, 678 F. Supp. 64, 66-67 (S.D.N.Y. 1988) ("The right to a fair trial, in the context of prejudicial pre-trial publicity and the

28

potential tainting of the jury pool, is satisfied where . . . an impartial jury has been selected[,] . . . [a] constitutional standard [that] . . . is by definition met where the jurors have acquitted the defendant."), *aff'd* 848 F.2d 43 (2d Cir. 1988); *see also Schiavone Constr. Co.*, 678 F. Supp. at 66 ("[N]o denial of a fair trial can be shown where the plaintiff was acquitted of the crime charged."); *Sears v. City of Chicago*, No. 84-CV-3678, 1986 WL 5209, at *5 (N.D. Ill. Apr. 28, 1986) (dismissing Section 1983 ineffective assistance claim on grounds that because the plaintiff "was acquitted at trial, his right to a fair trial obviously was not prejudiced").  These cases, and the cases holding that a defendant's acquittal extinguishes a *Brady* violation, have long coexisted with the understanding that procedural due process protects an individual's right to a proper hearing prior to a deprivation even where such a hearing would not have prevented the deprivation.  *See Carvajal*, 542 F.3d at 570 n.2 ("[T]here is not a parallel from *Carey*'s holding to the materiality/prejudice requirement of *Brady*, which requires more in order to establish the constitutional violation at issue.").

Nor is the Court persuaded by *Haupt v. Dillard*, 17 F.3d 285 (9th Cir. 1994), in which the Ninth Circuit relied on *Carey* in holding that an acquitted criminal defendant could state a Section 1983 due process claim against prosecutors for allegedly "intimidat[ing] the judge into changing his jury instructions," *id.* at 287-88.  As a result of this alleged misconduct, the plaintiff claimed that he "did not get the unbiased judge to which he was entitled"; the *Haupt* court held that the plaintiff had thus stated a claim for violation of his due process right to a fair trial — i.e., the right to "get the unbiased judge to which he was entitled" — and that his "ultimate[] . . . acquitt[al] speaks only to the amount of damages he suffered[ and] is irrelevant to whether he has a cause of action."  *Id.* at 287.  The *Haupt* court reached this conclusion solely by analogy to

29

the Ninth's Circuit's holding, in *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992) (en banc), that

the "interrogation of a suspect in violation of his *Miranda* rights was actionable even though the

suspect was never charged and the resulting statement was never used." *Haupt*, 17 F.3d at 288.

*Cooper*, however, has been overruled by *Chavez v. Martinez*, 538 U.S. 760 (2003), *see Doody v.

Schriro*, 548 F.3d 847, 861 (9th Cir. 2008) (recognizing *Cooper*'s overruling by *Chavez*); *Higazy

v. Templeton*, 505 F.3d 161, 171 (2d Cir. 2007) ("The Supreme Court [in *Chavez*] concluded that

an officer could not be subjected to civil liability for an alleged violation of the privilege against

compelled self-incrimination where the coerced statement is not thereafter used against the

person who gave the statement."), leaving *Haupt*'s reasoning entirely unsupported by any valid

authority.[7]

    The Court therefore holds that Plaintiff has failed to state a claim for violation of the

Fourteenth Amendment's Due Process Clause based on his allegations that evidence favorable to

him was improperly suppressed.[8]  Accordingly, any *Monell* claim alleged against the City on

those grounds is also dismissed.

### 3.  Plaintiff's Fourth Amendment Claims

    Plaintiff alleges that Defendants "falsely arrested and imprisoned plaintiff, maliciously

---

[7] The Court notes that it does not appear that the relevant holding in *Haupt* has ever been cited by any federal court within the Second Circuit, either before or after *Cooper* was overruled.

[8] This includes both Plaintiff's putative *Brady* claims, discussed above, and any due process claim Plaintiff might assert based on the alleged withholding of exculpatory evidence from the grand jury that indicted Plaintiff.  The Supreme Court has held that a prosecutor has no constitutional obligation to provide exculpatory information to a grand jury, *see United States v. Williams*, 504 U.S. 36, 52 (1992) ("[N]either in this country nor in England has the suspect under investigation by the grand jury ever been thought to have a right . . . to have exculpatory evidence presented."), and that "courts have no authority to prescribe such a duty pursuant to their inherent supervisory authority over their own proceedings," *id.* at 55.

prosecuted him, and failed to intercede on behalf of plaintiff and to protect plaintiff from the

unjustified and unconstitutional treatment he received" (SAC ¶ 40), that the City failed to train,

supervise, and discipline its police officers and prosecutors (*id.* ¶¶ 44, 46-47), and that the City's

policies in this regard violated Plaintiff's constitutional rights (*id.* ¶¶ 45-46).  Although Plaintiff

does not specify which constitutional provision the City allegedly violated, the Second Amended

Complaint can be fairly read to assert violations of Plaintiff's Fourth Amendment rights.[9]

---

[9] The Court briefly notes that Plaintiff's allegations of false arrest and malicious
prosecution state a claim *only* under the Fourth Amendment, and not under the Due Process
Clause of the Fourteenth Amendment.

In *Albright v. Oliver*, 510 U.S. 266 (1994), although no single opinion commanded a
majority, the Supreme Court held that "a plaintiff who has alleged that a criminal prosecution
was initiated against him without probable cause has not stated a § 1983 claim for violation of
his right to substantive due process."  *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997); *see
also Albright*, 510 U.S. at 273 (plurality opinion) ("Where a particular Amendment provides an
explicit textual source of constitutional protection against a particular sort of government
behavior, that Amendment, not the more generalized notion of substantive due process, must be
the guide for analyzing these claims." (internal quotation marks omitted)); *id.* at 274-75 ("The
Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth
Amendment to address it. . . . [Therefore,] substantive due process . . . can afford [the plaintiff]
no relief."); *Rolon v. Henneman*, 517 F.3d 140, 148 n.4 (2d Cir. 2008) ("The Supreme Court in
*Albright* . . . held that only violations of the Fourth Amendment can support § 1983 claims for
malicious prosecution."); *Mayer v. City of New Rochelle*, No. 01-CV-4443, 2003 WL 21222515,
at *8 (S.D.N.Y. May 27, 2003) ("A § 1983 claim of criminal prosecution without probable cause
may not be based upon denial of due process rights, but only upon denial of Fourth Amendment
rights.").  *But see Zahrey v. Coffey*, 221 F.3d 342, 344 (2d Cir. 2000) ("We hold that there is a
constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a
government officer acting in an investigatory capacity, at least where the officer foresees that he
himself will use the evidence with a resulting deprivation of liberty.").

Nor can Plaintiff state a claim for the violation of his procedural due process rights,
because New York allows Plaintiff to sue in tort for false arrest and malicious prosecution;
indeed, Plaintiff has included such claims as part of this lawsuit (SAC ¶¶ 61-66).  *See Newsome
v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001) (interpreting *Albright* to have held that "satisfying
the elements of the state-law tort of malicious prosecution, far from being the foundation of a
constitutional tort . . . , *knocks out* any constitutional tort of malicious prosecution, because,
when a state-law remedy exists, Justices Kennedy and Thomas conclude that due process of law
is afforded by the opportunity to pursue a claim in state court, and four other Justices did not
think that the due process clause applies in the first place" (citing *Albright*, 510 U.S. at 281-86
(Kennedy, J., concurring, joined by Thomas, J.))); *see also Aretakis v. Durivage*, No.

a.  False Arrest

"[A] § 1983 claim for false arrest derives from [the] Fourth Amendment right to remain

free from unreasonable seizures, which includes the right to remain free from arrest absent

probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006); *see also Espada v.

Schneider*, 522 F. Supp. 2d 544, 551 (S.D.N.Y. 2007).  "In analyzing claims alleging the

constitutional tort of false arrest, '[the Second Circuit] ha[s] generally looked to the law of the

state in which the arrest occurred.'"  *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir.

2007) (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)); *see also Rheingold v.

Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 389 (S.D.N.Y. 2008) ("A claim for false

arrest, resting on the Fourth Amendment right to be free from unreasonable seizures, is

substantially the same as a claim for false arrest under New York law." (internal quotation marks

omitted)).

"Under New York law, the elements of a false imprisonment [or false arrest] claim are:

(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the

confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was

not otherwise privileged."  *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) (first and

second alterations in original); *see also Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975)

(same, discussing false imprisonment).[10]  "Under New York law, the existence of probable cause

---

07-CV-1273, 2009 WL 249781, at *20-21 (N.D.N.Y. Feb. 3, 2009) ("Maybe [the plaintiff's]
claims of false arrest and malicious prosecution also amount to a violation of his . . . procedural
due process rights under the Fourteenth Amendment. . . . [However, a]ccepting that [the
plaintiff] was arrested and had to endure a criminal prosecution, those pretrial deprivations of
liberty . . . were subsumed into the Fourth Amendment.").

[10] "False arrest and false imprisonment claims are identical in New York."  *Martinez v.
City of New York*, No. 06-CV-5671, 2008 WL 2566565, at *2 (S.D.N.Y. June 27, 2008).

is an absolute defense to a false arrest claim." *Jaegly*, 439 F.3d at 152. "An officer has probable cause to arrest when he or she has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Id.* (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).

Plaintiff alleges that Rosario and other police officers "seized" him on September 27, 1999 (SAC ¶ 22), that at this time it was "immediately apparent" to the officers that Plaintiff's arm was in a hard plaster cast (*id.* ¶ 23), that Plaintiff was arraigned on September 28 despite confirmation that his arm was in the cast at the time of the shooting and despite witnesses' statements that perpetrators used both hands and arms during the shootings (*id.* ¶¶ 25-26, 29), and that "defendants falsely arrested and imprisoned plaintiff" (*id.* ¶ 40). Though Defendants' motion papers do not explicitly address Plaintiff's claim of false arrest, they do assert that "the moving force behind plaintiff's arrest . . . was the evidence presented against him" (Defs.' Mem. 18) and that "there existed ample evidence establishing probable cause that [Plaintiff] did in fact commit the crime charged" (Defs.' Reply Mem. 1 n.1).

Plaintiff's allegations are sufficient to a state a Section 1983 claim for false arrest in violation of the Fourth Amendment, as he has averred that the Individual Defendants arrested him and assisted in his prosecution (which resulted in his being detained, i.e., seized, between arrest and acquittal), in spite of evidence that was squarely inconsistent with his guilt. For example, according to Plaintiff, these Defendants arrested Plaintiff in spite of the fact that Plaintiff had a hard plaster cast on his left arm, a fact not mentioned by any of the witnesses to the murder when describing the participants in the shooting, and that Plaintiff was identified by a

line-up witness after that witness had been coached.  This is sufficient to make plausible

Plaintiff's false arrest claim.  *See Blake v. Race*, 487 F. Supp. 2d 187, 207 (E.D.N.Y. 2007)

(denying summary judgment where plaintiff presented evidence that key witness was "fed facts"

and "pressured to falsely implicate" plaintiff).  Thus, while a law enforcement officer has no

constitutional duty to "prove the plaintiff's version of the events wrong before arresting him,"

*Rheingold*, 568 F. Supp. 2d at 392, or to "explore and eliminate every theoretically plausible

claim of innocence before making an arrest," *Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123,

128 (2d Cir. 1997), Plaintiff has alleged that the individually named defendants pursued their

arrest of Plaintiff in the knowing absence of probable cause, and that these defendants

subsequently assisted the prosecutor in misleading the Grand Jury and withholding exculpatory

information from Plaintiff before and during trial.  While the facts adduced during discovery

may very well show that, as a matter of law, there was probable cause to support Plaintiff's

arrest (and subsequent prosecution), Plaintiff's allegations foreclose this Court from so finding

as a matter of law at this stage.  *See Hill v. City of New York*, No. 05-CV-9473, 2006 WL

2347739, at *3 (S.D.N.Y. Aug. 14, 2006) (finding that plaintiff stated cause of action for false

arrest in spite of witness information which inculpated plaintiff); *Middleton v. City of New York*,

No. 04-CV-1304, 2006 WL 1720400, at *6 (E.D.N.Y. June 19, 2006) (denying motion to

dismiss, after drawing all inferences in favor of plaintiff regarding whether the police were

aware of information that raised doubt about a victim's veracity, and holding that the court could

not determine as matter of law that defendants had probable cause to arrest plaintiff).

### b.  Malicious Prosecution

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a

plaintiff must show a violation of his rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law." *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) (internal citations omitted).

To show a violation of her Fourth Amendment rights, a Section 1983 plaintiff asserting a malicious prosecution claim "must . . . show some deprivation of liberty consistent with the concept of 'seizure.'" *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995); *see also Rohman v. N.Y. City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (requiring "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights"). "To establish a malicious prosecution claim under New York law, a plaintiff must show that a proceeding was commenced or continued against him, with malice and without probable cause, and was terminated in his favor." *Fulton*, 289 F.3d at 195.

There is no doubt that Plaintiff adequately alleges that a proceeding was commenced against him (and continued against him through trial), that it was terminated in his favor (with his acquittal), and that he was subjected to a deprivation of liberty tantamount to a Fourth Amendment seizure during the pendency of the proceeding (as he was incarcerated for over two years after his arraignment).  As discussed above in the context of Plaintiff's false arrest claim, Plaintiff also sufficiently alleges that his initial arrest was without probable cause; moreover, his averments are sufficient, at this stage, to rebut the presumption that his prosecution was supported by probable cause due to his indictment by the grand jury.  *See McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006) ("Although a grand jury indictment gives rise to a presumption that probable cause exists and a claim for malicious prosecution in relation to the crimes described in the indictment thereby is defeated, it should be noted that the presumption may be

rebutted by evidence of various wrongful acts on the part of police . . . ."); *Richards v. City of New York*, No. 97-CV-7990, 2003 WL 21036365, at *14 (S.D.N.Y. May 7, 2003) ("Although the government has no constitutional obligation to present exculpatory material to a grand jury, New York law . . . strips an indictment of its presumptive force in a malicious prosecution action when the indictment was obtained through improper means." (internal citation omitted)); *Colon v. City of New York*, 455 N.E.2d 1248, 1250-51 (N.Y. 1983) ("The presumption may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith.").  Plaintiff alleges that the Individual Defendants and O'Connell withheld exculpatory evidence from Plaintiff and from the grand jury (SAC ¶¶ 31-32, 35-36), that they conducted a unreliable lineup designed to induce witnesses to misidentify Plaintiff (*id.* ¶ 27), and that they coerced a lineup witness into implicating Plaintiff (*id.*).[11]  These same allegations suffice to state a claim of actual malice as well.  *See Rounseville v. Zahl*, 13 F.3d 625, 631 (2d Cir. 1994) ("New

---

[11] The Court briefly notes that Defendants are mistaken in claiming that "Plaintiff cannot sustain a *Monell* claim based on the actions of the NYPD detectives" (Defs.' Mem. 13 n.8) because "the police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors," *Walker*, 974 F.2d at 299.  As discussed above, Plaintiff fails to state a claim that his *Brady* due process rights were violated, because of his acquittal, but his Fourth Amendment rights against malicious prosecution are a different matter.  In particular, evidence that the police and the prosecutor withheld *Brady* material from a defendant may support a malicious prosecution claim under the Fourth Amendment.  *See Kinzer v. Jackson*, 316 F.3d 139, 143-44 (2d Cir. 2003) ("A malicious prosecution claim can rest on a prosecution that is continued notwithstanding the discovery of information that exculpates the defendant . . . ."); *Blake*, 487 F. Supp. 2d at 214 n.19 (treating *Brady* allegations as supporting separate causes of action for due process violation and malicious prosecution).  Moreover, the Individual Defendants' misconduct alleged by Plaintiff is not limited to withholding of favorable evidence; Plaintiff also alleges fabrication of evidence resulting from coercion of witnesses and faulty investigative practices.  *See Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003) (noting that use of evidence fabricated after arrest could support a malicious prosecution claim).

York courts have held that the existence of malice may be inferred from a finding that defendants lacked probable cause to initiate criminal proceedings."); *Nardelli v. Stamberg*, 377 N.E.2d 975, 976 (N.Y. 1978) ("The 'actual malice' element of a malicious prosecution action does not require a plaintiff to prove that the defendant was motivated by spite or hatred . . . . Rather, it means that the defendant must have commenced the . . . criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.").

### c. *Monell* Liability

Defendants raise several objections to Plaintiff's allegations that the City's failure to train, supervise, and discipline its police officers and prosecutors violated his Fourth Amendment rights.  Defendants assert, first, that the *Brady* violations listed in the Second Amended Complaint do not support Plaintiff's claim that the City failed to train its employees as to their *Brady* obligations, because the criminal defendants in those other cases were convicted.  (Defs.' Mem. 11.)  Second, the City cannot be held liable for failing to train its prosecutors as to their *Brady* obligations, as those obligations are "now so obvious that little training, if any, is required."  (*Id.* 16.)  Third, because "there is no constitutional obligation to present exculpatory evidence to a grand jury, . . . any claim for a failure to train in that regard must also fail."  (*Id.* 17.)  Fourth, Plaintiff's Second Amended Complaint itself demonstrates that there was significant evidence implicating Plaintiff in the shootings, such that "the moving force behind plaintiff's arrest and prosecution was the evidence presented against him," and could not have been the City's policies.  (*Id.* 18.)  Fifth, Plaintiff "simply fails to allege sufficient facts to support an inference that such training failures exist" in any area besides training as to compliance with *Brady*.  (*Id.* 11.)  Sixth, Plaintiff fails to allege "that there is an established

history of New York County prosecutors knowingly prosecuting innocent individuals." (*Id.* 12.) Seventh, the City cannot be liable for failing to train its employees "not to maintain prosecutions where there is no reasonable likelihood that guilt can be proven beyond a reasonable doubt," because the "obligation not to . . . prosecute innocent individuals is so obvious that no training . . . is required." (*Id.* 12-13.)

Each of these arguments is unavailing. Defendants' first two arguments are moot in light of the Court's conclusion that Plaintiff fails to state a claim for violation of his *Brady* due process rights. However, Plaintiff's *Monell* claim with respect to the suppression of exculpatory evidence is not just that the City failed to train its employees as to *Brady*. Rather, the claim is also that the City failed to train as to malicious prosecution, which resulted in several malicious actions taken by the Individual Defendants and O'Connell, including their decision to withhold favorable evidence from Plaintiff — evidence which, if disclosed to Plaintiff, might have resulted in the dismissal of the prosecution and the speedier release of Plaintiff from detention. Defendants' third argument is similarly beside the point, as the fact that a criminal defendant has no independent constitutional right to have exculpatory evidence presented to a grand jury does not negate the possibility that the incompleteness of O'Connell's presentation to the grand jury resulted in an indictment unsupported by probable cause, and that this resulted from the City's insufficient training as to its obligation not to pursue malicious prosecutions. (Moreover, Plaintiff's claim is not only that exculpatory evidence was withheld from the grand jury, but also that fabricated evidence was affirmatively presented to it.) Defendants' fourth argument uses the "moving force" language of *Monell* but essentially is merely a denial that Plaintiff's Second Amended Complaint states any claim of false arrest or malicious prosecution, a contention that

the Court has already rejected above.

Defendants' fifth and sixth arguments are premised on an inappropriately high standard of pleading.  Plaintiff specifically alleges that the City was aware that its law enforcement officials would confront situations involving the interviewing of witnesses, the use of lineup identifications, and the obligation to disclose exculpatory material to criminal defendants, that these situations would require difficult choices of a sort that training could address, that there were other instances of law enforcement officials mishandling information (at least with respect to the disclosure of exculpatory materials), and that wrong decisions by the City's law enforcement officials would likely cause the deprivation of an individual's constitutional rights. These allegations, while not accompanied by detailed evidentiary support, are sufficient, particularly because it is the City that is in possession of information regarding its training policies on these issues.  *See Amnesty Am.*, 361 F.3d at 130 n.10 ("It is unlikely that a plaintiff would have information about the city's training programs or about the cause of the conduct at the pleading stage, and therefore need only plead that the city's failure to train caused the constitutional violation."); *Hall v. Marshall*, 479 F. Supp. 2d 304, 316 (E.D.N.Y. 2007) (holding that plaintiff adequately alleged *Monell* liability based on claim that City had a practice, policy, and custom of failing to train its officials in preparing accurate presentence reports); *Nesbitt*, 2006 WL 3511377, at *4 (denying motion to dismiss where plaintiff merely alleged that there was "'an official policy of negligent supervision and training of law enforcement officials which rises to the level of deliberate indifference to the constitutional rights of those within its domain'" and that "'[h]igh level county officials have personally participated in the maintenance of this policy by their active inattention to or knowing acquiescence in misconduct by law

enforcement personnel'" (alteration in original)); *Babi-Ali v. City of New York*, 979 F. Supp. 268,

274 (S.D.N.Y. 1997) (noting that plaintiff's allegations regarding "a history of mishandling

situations involving *Brady* material" were sufficient to state a *Monell* claim).

As to Defendants' final argument — that the "obligation not to . . . prosecute innocent

individuals is so obvious that no training . . . is required" — they rely on *Walker v. City of New*

*York*, which rejects rather than supports their position.  In *Walker*, the Second Circuit stated:

"Where the proper response — to follow one's oath, not to commit the crime of perjury, and to

avoid prosecuting the innocent — is obvious to all without training or supervision, then the

failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support

an inference of deliberate indifference by city policymakers to the need to train or supervise."

974 F.2d at 300-01.  However, the court added:  "While it is reasonable for city policymakers to

assume their employees possess common sense, where there is a history of conduct rendering

this assumption untenable, city policymakers may display deliberate indifference by doing so."

*Id.* at 300; *accord Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006) (reversing

grant of summary judgment on plaintiff's *Monell* claim, on grounds that the district court "failed

to consider that evidence of failure to train on the proper handling of exculpatory materials has

the 'highly predictable consequence' of constitutional violations").  Though the plaintiff in

*Walker* had "not expressly alleged a history of police perjury," the Second Circuit reversed the

district court's dismissal of his *Monell* claims, holding that he "should be allowed to pursue

discovery in order to determine whether there was a practice of condoning perjury (evidenced

perhaps by a failure to discipline for perjury) or a pattern of police misconduct sufficient to

require the police department to train and supervise police officers to assure they tell the truth."

*Walker*, 974 F.2d at 300.

Accordingly, the Court concludes that Plaintiff has sufficiently alleged that the City is liable for causing, through its failure to train, supervise, or discipline, its employees, the false arrest and malicious prosecution of Plaintiff in violation of his Fourth Amendment rights. Defendants' motion to dismiss those claims against the City is therefore denied.

D.  Bifurcation

Because some of Plaintiff's *Monell* claims survive Defendants' motion to dismiss, it is necessary to address Defendants' request that the *Monell* claims against the City be bifurcated from Plaintiff's other claims, and that discovery as to Plaintiff's *Monell* claims be stayed pending resolution of Plaintiff's non-*Monell* claims.  (Defs.' Mem. 19-21.)

"Rule 42(b) of the Federal Rules of Civil Procedure affords a trial court the discretion to order separate trials where such an order will further convenience, avoid prejudice, or promote efficiency.  Therefore, bifurcation may be appropriate where, for example, the litigation of the first issue might eliminate the need to litigate the second issue, or where one party will be prejudiced by evidence presented against another party."  *Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999) (internal citations omitted).

Defendants assert that "if a jury concludes that no individual defendant is liable, then there is no need for discovery or litigation on any *Monell* claim, since *Monell* liability would be impossible."  (Defs.' Mem. 20.)  Defendants are incorrect.  As Judge Chin noted at the August 10, 2004 hearing, because all of the Individual Defendants are police officers — and not employees of the District Attorney's Office[12] — a judgment in favor of the Individual

---

[12] The Court notes that the Second Amended Complaint contains three references to "defendant O'Connell."  (SAC ¶¶ 60, 64, 65.)  O'Connell was originally named as a defendant in

Defendants would not preclude *Monell* liability pertaining to the City's training of its prosecutors. Judge Chin stated: "If I deny the motion [to dismiss Plaintiff's *Monell* claims based on the District Attorney's conduct], then I'm going to allow *Monell* discovery. There's no point in bifurcating it, because that's really all we have with respect to that part of [the case]." (Decl. of Leah A. Bynon in Supp. of Defs.' Partial Mot. to Dismiss, Ex. A (Aug. 10, 2004 Oral Argument Tr.), at 25.) This Court agrees, and further finds that it is not appropriate to bifurcate with respect to the City's potential *Monell* liability regarding its supervision, training, and discipline of its police officers. "Any spillover prejudice to the individual officers that may be caused by the admission of Rule 404(b) evidence [at trial] to establish the *Monell* claim [pertaining to the Individual Defendants] could be cured by limiting instructions." *Rosa v. Town of E. Hartford*, No. 00-CV-1367, 2005 WL 752206, at *5 (D. Conn. Mar. 31, 2005). Moreover, "separate trials would not be efficient and would inconvenience the court, the jury, and the plaintiff." *Id.*

Accordingly, Defendants' request to bifurcate is denied.

## III.  Conclusion

For the reasons stated above, Defendants' Rule 12(c) motion to dismiss Plaintiff's Section 1983 *Monell* claims against the City is granted in part and denied in part. Plaintiff's *Brady* claim against the City, along with any other Fourteenth Amendment due process claims or Fifth Amendment claims against the City, are dismissed for failure to state a claim. Plaintiff's

---

this case, but she was not so identified in the caption of the Second Amended Complaint or in its section naming the Parties (*id.* ¶¶ 7-14), and she was terminated from the case on October 22, 2004, the date on which the Second Amended Complaint was filed. This Court thus considers the Second Amended Complaint's references to O'Connell as a defendant to be typographical errors.

surviving federal claims against the City are his claims that the City's failure to train, supervise, and discipline its police officers and prosecutors caused the false arrest and malicious prosecution of Plaintiff in violation of the Fourth Amendment.  Defendants' request to bifurcate and to stay discovery as to Plaintiff's *Monell* claims is denied.  The Clerk of Court is respectfully directed to terminate the pending motion (Dkt. No. 40).

SO ORDERED.

Dated:  March 31, 2009
        White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

43

Service List (by mail)

Lawrence A. Vogelman, Esq.
Shuchman & Krause-Elmslie, P.L.L.C.
42 Hampton Road
P.O. Box 220
Exeter, NH  03833-0220

Michael L. Spiegel, Esq.
111 Broadway, Suite 1305
New York, NY  10006

Leah Amber Bynon, Esq.
New York City Law Department
Office of the Corporation Counsel
100 Church Street
New York, NY  10007